Good morning again. I do want to advise the attorneys before we proceed that Justice Cahill is the third panel member on this case and he will fully participate in the decision. He's unable to be here this morning. If both attorneys could step up and identify yourselves for the record. Good morning, your honors. Assistant State's Attorney Sarah McGann on behalf of the people. Formerly Sarah Phillips on the brief. Good morning. I'm Michael Davidson, Assistant Public Defender representing Amara Maxey. Good morning. Each of you will have 15 minutes to present your arguments and from that Ms. McGann you may save out some time for rebuttal. Thank you, your honor. May it please the court. Your honors, again, Assistant State's Attorney Sarah McGann on behalf of the people of the state of Illinois. Your honors, the trial court in this case erred as a matter of law when it granted defendants motion to quash arrests and suppress evidence. And that is because the Chicago police officers in this case had ample probable cause when they stopped and arrested the defendant. Your honors, the probable cause standard is lessened when police officers are aware that a recent crime has been committed. And here you have officers working in concert with one another who learn that the defendant had just committed an attempt aggravated robbery at an upholstery store. These officers, what they knew at this time was the defendant went into an upholstery store on 105th and Western. He attempted to rob two victims. Those two victims did break away from the defendant. The defendant flees. They make a 911 phone call. It's around noon. It's in October afternoon, your honors. The defendant flees. There are four eyewitnesses near that scene who also make 911 phone calls. And you also have a responding officer to that scene who speaks with the victims and gets a description of the defendant and the vehicle that he fled in. You have a sergeant who's on patrol. He gets radio dispatch of this information. Here is what that sergeant learns from radio dispatch. That the defendant fled in a burgundy red Oldsmobile with temporary license plates. That the defendant is a tall, over six feet, African American male. And he's wearing a light blue cap with dark clothing on. The 911 phone calls that are made just within minutes of this incident and within minutes of one another, they corroborate this information. And this is also information that the victims give to that responding police officer on the scene. So here you have a sergeant who spots a car matching that description as it's headed eastbound on 103rd Street. I must point out that one of the callers did indicate that the vehicle fled eastbound on 106th Street. So this puts the vehicle in proximity to the store on 105th and Western. Defendant is seen fleeing in a car on 106th Street. And now a sergeant within minutes sees that vehicle on 103rd and Charles, less than a mile away. It's near Julian High School, near the 57 overpass there. The sergeant dispatches two other patrolling officers, again, who are working in concert with one another, that he spotted this vehicle. It's at that point that the sergeant and the other two responding officers who are in their respective squad cars, they approach. They have probable cause to arrest the defendant. He's in this distinctly described vehicle. And when they do stop the defendant and approach... What gives them the probable cause at that point, though? Your Honor, the defendant is in the same proximity of a recent crime that just occurred less than a mile away. He's in a car that's described as a burgundy-red Oldsmobile with temporary license plates. It's distinct and not at that point. And when the officers approach the defendant, it ripens into even more probable cause. That's my question. How does it ripen when they stop him? It ripens because he's sweating profusely. He's acting nervous. He fits the description of the offender, Your Honor. He's a tall African-American male who's sitting next to clothing. I know there was testimony that he was sweating. I don't recall. Was there further testimony that he was acting in some sort of furtive manner, though? Your Honor, just that he was sweating profusely, and I would argue that that is indicative of acting in a suspicious manner. And then there were the items in the car. That's correct, Your Honor. There were items fitting the descriptions that were made in those 911 phone calls. Dark vest or jacket, a baby blue cap. Those were sitting next to the defendant. Well, you argue alternatively that either probable cause existed at the time that he was stopped or reasonable suspicion, and then when he was returned to the scene, he was promptly identified. And you cite two different cases. Well, you cite numerous cases, but Bennett primarily for the reasonable suspicion, and then the Supreme Court case for probable cause Hopkins. Correct, Your Honor. In Hopkins, the court said that the facts ripened into probable cause because when he got out of the car, there was evidence that he had been in the snow, and there was snow on the ground. Did they say anything else? And then that he had, I thought, moved back in the car. Well, in People v. Hopkins, the Supreme Court has spoken on this very issue, and it is controlling of this case. In fact, we have even more in this case. Your Honor is absolutely correct. In that case, patrolling officers were dispatched a description of two African American males in their 20s. That was a December evening. There were snow banks. An officer is immediately in that area within minutes and sees an individual, just one individual, in a car, a parked car, leaned back, as Your Honor noted, acting suspicious in that manner. And there's really no one else in this area. The officer approaches and has the defendant get out of the car and does see the snow on the defendant's pant leg, which was probable cause at that moment. And we would argue in this case, there's even more. The offender is... Well, the probable cause... The definition contains two parts. One is that there's a reasonable likelihood that the person committed a crime. And then the second prong is that this is actually the offender that committed that crime. In this case, we have a return to the scene when he's actually identified. So how is that double, the two parts of the prong, how are they really complete at the first setting here when they stop him? How has anyone confirmed that he's the perpetrator? I believe that an offense had been committed and that he was the offender. Yes, that's correct, Judge. Would it make any difference if the baseball cap and the coat were in the trunk as the defendant testified? Your Honor, it would not make any difference in this case. I believe that based on the physical description of the defendant, that he was over six feet tall, he's an African American male, he's driving this distinctly described car, a burgundy red Oldsmobile with temporary license plates. I do believe that we have to give deference to the trial court's factual findings and there were credibility determinations made and we would argue that the defendant was not credible in his testimony and that it's hard to believe that those items were placed in the trunk. But the credibility determinations, those aren't determinations of the trial court. That's correct, Your Honor. The trial court could believe or disbelieve the defendant or the police officer. That's correct. And that's what he did do here. He believed one over another. Isn't that what happened? That's correct. But to answer your question, Your Honor, the fact that the defendant testified that those items were in the trunk are irrelevant. Okay. We do believe that Phyllis Hopkins speaks to this very issue and as I previously stated, we have even more here. The officers working in concert were looking for just one offender and they had a description of that offender and they stop and detain him and arrest him at the moment that they see him in that car, just a few blocks from the crime scene. And we do believe that based on what I've just argued here and the reasons contained in our brief that you should reverse the trial court's decision. Anything further? All right. You have a few minutes for rebuttal. Thank you. Mr. Davidson? Thank you. I just need a quick drink today. I'm sorry. That's all right. Let me ask you a question before you start. Yes, Your Honor. Isn't it very unique here that we have a burgundy car with temporary plates? I mean, not very many cars have temporary plates, do they? Well, I wouldn't say it's rare. But I mean, if a getaway car has temporary plates and it's red and all of a sudden we got a red car, a burgundy car with temporary plates, you don't think that there's a reasonable suspicion that the driver might be the person who committed the crime? No, I don't judge. Because looking at more of the facts that were below before the trial court, yes, there was, I believe, the first report from Officer Nologan, who was at the scene of that store shortly after events occurred. And he spoke to the store owner's son, I believe, that was Hector Hernandez. And Hector Hernandez was the one person that said that he saw the offender get into that burgundy car with the temporary plate. One thing the trial court noted, though, there were no other details about the car. Nothing about the car, a guess regarding its age, a guess regarding what kind of Oldsmobile. There's many kinds of Oldsmobile, not even whether it's two-door or four-door. And, Your Honor, when we had the defendant, Mr. Mackey, testifying, the state did not rebut his testimony whatsoever that the car he was driving when police stopped him was light red and black. That was completely unrebutted. And, Your Honor, in cases like this, where the car is essentially the identity of the case, the police send out their evidence technicians, they photograph the scene, they photograph the car. Nothing, no testimony, no photograph, nothing was put forth to rebut Mr. Mackey's testimony that, no, I was not in a burgundy car. I was in a black and light red car. Didn't, though, Sergeant Coughlin testify that it was a burgundy Oldsmobile? Sergeant Coughlin testified that he was following, yes, a burgundy Oldsmobile. So, there's conflicting testimony. The defendant said it was a light red and black car, but the sergeant said it was a burgundy car. Correct. I'll just add to that, though, that the sergeant would have already heard messages saying burgundy. Did the trial court, in its conclusions, ever make a factual determination about the color of the car? No, they did not specifically decide whether, the trial court did not specifically define what color the trial court found this to be. All right, so if there's conflicting testimony, then we don't have to give any deference to that, do we, since he didn't make a finding about the color? No, correct. But in looking at these facts on this point, then, de novo, it does not meet the standard for reversal when we have facts that are ambiguous on the issue, and facts which easily could have been rebutted by the state, and the state, the police do their job. The state decided not to put on anything to try to rebut Mr. Maxey's testimony that his car was black and light red. Well, in this particular case, though, there are a few calls coming in, but there is a description that the offender was a male black, about 6'2". He was fleeing in a red car. It had temporary plates. He was wearing a blue cap and a black vest, something like that. I mean, would you agree that information was in the record? Well, in the record was, one, he's wearing a black jacket, then he's wearing a blue vest, then he's wearing a black vest. But the officers do observe a car that fits the description. Is there not a reasonable suspicion that this particular car might be being driven by the offender in the recent attempt armed robbery? First, I would say there was not a reasonable suspicion. We're roughly a mile and a half away from where things occurred, and I know cars are able to travel a good distance in a short time. But we're about a mile and a half away from the store on Western. And again, the testimony was under-butted that Mr. Maxey was in a light red and black car. Well, I guess I'm asking then, in this case, your position would be that the police really shouldn't have detained him at all. Correct. They shouldn't have brought him back for an identification to see, to rule in or out whether he was the offender. Correct. And, Judge, for the sake of argument, let's say for the sake of argument that it was reasonable for police to stop this car because it was a red car a mile and a half away from where something had occurred. For a moment, assuming that was reasonable. A Terry stop escalates or can escalate into an improper arrest when it becomes more invasive than is required in that circumstance for the police or law enforcement to do what they have to do. After they stop the car, the car cannot pull forward or backwards. It is stopped. The police have information that is inconsistent to begin with. With four different descriptions of clothing, there are two calls in that the offender has a mustache and a goatee beard. Mr. Maxey was proven at trial at the hearing below by the photograph that was taken of him after his arrest. I'm sorry. The evidence was that the offender was clean shaven. I'm sorry. I misspoke. I apologize. That the offender was clean shaven. It was shown that at that time, Mr. Maxey had a mustache and a goatee beard. So let's say that it was a proper Terry stop. Before he is locked into the police wagon, the police have an opportunity to flush out this situation and determine. Isn't that what they did, though, Mr. Davidson, when they took him back to the scene for that brief, you know, for lack of a better word, show up, when he was immediately identified? Wouldn't that either rule him in or rule him out? Well, that could, Judge, but a show up is not automatically allowed. No, but how would you confront the Bennett case that the state cited? Or distinguish, I think, might be the better word. Unlike that case, in this case, once police, for the sake of arguments, had a proper copy of Mr. Maxey's car, they have the radios. They could have called and checked the descriptions again that came through, and they would have seen that, no, these are inconsistent. These are incomplete. And some of them don't match Mr. Maxey. That would be the least invasive way, the way that would have been so invasive that the Terry stop escalated into an arrest without probable cause. That would have been the way to handle it, to keep a proper Terry stop from escalating into the improper seizure and show up. Just to point out a couple of things that the state has focused on regarding one of the cases they've given great weight to with Hopkins. One of the things that's important to distinguish from our situation in Hopkins is, in Hopkins, there were no inconsistencies. In the evidence regarding descriptions of the offender or descriptions of the car. And when we're dealing with a case that's a limited amount of information, that's a huge distinguishing point between a case like Hopkins and our situation. So I do not think that Hopkins is good authority for us to follow. Well, Hopkins is a Supreme Court decision. Well, of course we follow, but because it's so distinguishable. Yes, I'm forgiving my wording of that, Judge, Your Honor. And I also think that it's important to remember, just in terms of when that original stop occurred, the officer even admitted that he stopped this car because it was a red car with a temporary plate. Again, I do not believe that in the case law, that in itself meets the standard even for a cherry stop. Red car with a temporary plate. Do you have any case that holds that? Not specifically a red car with a temporary plate, Your Honor. No, I don't. Notice the word temporary plates. I'm sorry? It's very distinguishable, is it not? Temporary plates? They are, Your Honor, but they are not rare or uncommon. And again, Your Honor, one thing the state stresses in its brief was Mr. Maxey's voluntary, the voluntary nature, the state argues, of Mr. Maxey going back to the scene of the storm. And the one thing I want to point out is if you look at the testimony directly regarding Officer Sweeney, who was the officer that pulled in front of Mr. Maxey's car and had Mr. Maxey get out of his car, what Officer Sweeney testifies was he told Mr. Maxey that they're going back to the storm. Before, he did not ask them, are you willing to go back? He told them, we're going back. So any argument that Mr. Maxey volunteered to go with, I believe is of little weight. At that point, if he said no, he would have been resisting the officer. The officer told them, we're going back. But the cases don't really hinge on whether the offender or this possible suspect agreed to go back. They generally hold that if there's a reasonable suspicion that criminal activity is afoot, that it's permissible that this isn't such an intrusion to return the person, if it's close in time and close proximity, to have the victim or eyewitness either rule the person in or out. I mean, there are numerous cases that hold that, and they don't hinge on this notion that the offender agreed to go. Correct me, Your Honor. The only reason I stress this is because the state stresses that fact to show that he was not under arrest or seized at that point. And a reasonable person would have thought they were not free to leave this encounter with the police at that time. If we were to conclude that there was reasonable suspicion and that the police had the right to bring him back for that brief period of time to determine one way or the other whether he was the offender or not, does it matter whether there was probable cause? If we conclude that in the final analysis, which is a question of law that we reviewed de novo, does it matter that the officers thought they had probable cause if we conclude at the end of the day that when they brought him back, they had a reasonable suspicion that criminal activity was afoot, that the intrusion was slight enough by returning him for this identification? Does it matter whether, does it have any impact on our decision whether they had probable cause initially or not? That's my question to you. It does matter, Judge, because again, that reasonable suspicion can escalate if the intrusion goes on more than is necessary for the officers to do their job after that initial carry stop. And in this case, even if the carry was proper, that intrusion exceeded what was necessary at the scene before the intrusion went further into the police wagon and back through the scene. Anything further, Mr. Davidson? No, Your Honor. If you have no questions, I would just ask that you affirm the trial court ruling below. Thank you. Ms. McGann, a brief response? Yes, Your Honor. Your Honor, just briefly. First, I must point out that counsel argues that the car may have been described as burgundy or light red, that the defendant had facial hair and may have not been described having facial hair in those 911 phone calls. Counsel focuses on these points. They're mere distractions from the mountain of evidence that we have here. And I would point out that in the defendant's booking photo, which was evidence at the trial court, his facial hair is scant and closely shaven and really appears to blend in with the defendant's face. So a fleeing offender from a scene who's running, that's not going to be the most obvious thing that's going to be described. What we have obviously described here is a tall African-American male who is wearing dark clothing, a baby blue cap, who jumps into a burgundy or light red Oldsmobile. As Justice Gordon pointed out, it may be distinct enough that it's described as that, but it also had temporary license plates, which makes it even more unique. And this car is seen within blocks of the scene, and it's stopped by an officer who's relying on credible information. We did point out People v. Jones, which is a case out of this district, 2007 case, which states that information from ordinary witnesses is presumed to be reliable. And here we have just that. In fact, we have four 911 phone calls, and we have information from the victims themselves. Well, did the dispatcher testify? Your Honor, yes. We had an individual from the Office of Emergency Management testify that these 911 phone calls are – she testified as to those phone calls. She can't testify as to the radio dispatch between police squad cars. That's not recorded. But she did testify to the times and the nature of the phone calls. Did she identify these people as saying they were victims or witnesses? Justice McBride, we do have the four phone calls made by eyewitnesses. Is that what she related when she testified? Yes, she just related to the content, yes, of those. And then we had the officer, Vic Sweeney, who arrives to the scene, and he – excuse me, I just want to make sure here. Officer Sweeney, he arrives at the stop. We have the officer who arrives to the original upholstery store who speaks with the witnesses, the victims there, and that information cannot be cataloged anywhere. That's the information that is then given to police dispatch. So we have that information from the responding officer to the scene, and what we have here is the Chicago Police Department is the central repository, if you will. We've got that information from the victims directly relayed to that responding officer, Officer Nelligan, I believe that was his name. And then we have the 911 phone calls, and those phone calls are dispatched to the patrolling officers, the sergeant and then Officer Sweeney. We do believe that should this court not consider that there was probable cause immediately upon seeing the vehicle, as soon as the officers approach the sergeant and Officer Sweeney and the other responding officer, it quickly ripens into probable cause. I mean, at the very least, the officers had reasonable and articulable suspicion to stop that vehicle, which then transcends into the probable cause. And for those reasons and the reasons contained in the people's brief, we would ask that you reverse the trial court's decision. Thank you. The case was well-argued and well-briefed, and it will be taken under advice.